IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:22-CV-302-FL

| | | |
|---|---|---|
| KIMBERLI LEWIS, *on behalf of herself and all others similarly situated,* | ) ) ) | |
| Plaintiffs, | ) ) | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION TO** |
| v. | ) ) | **STRIKE OPINIONS OF DEFENDANT'S EXPERT BEN BARCO, REBUTTAL** |
| EQUITYEXPERTS.ORG, LLC, | ) ) | **EXPERT KEITH MARINE AND PARTIAL MOTION TO EXCLUDE** |
| Defendant. | ) ) | **REBUTTAL EXPERT BEN RHODES** |
| | ) | |

Plaintiff moves to exclude Defendant EquityExperts.Org, LLC's ("Defendant" or "Equity") proffered expert opinions of Benjamin Barco, rebuttal expert Keith Marine, and to partially exclude the opinions of rebuttal expert Ben Rhodes pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993). Mr. Barco is an attorney with absolutely no experience in the areas of law at issue in this case. He is simply not qualified to testify as to his proffered opinions under Rule 702. Mr. Marine was completely unable to tie his property-management experience to the opinions formed in his report. Mr. Rhodes offered certain limited opinions which properly drew from his experience but also offered opinions where he admittedly had no knowledge base; and opinions derived from a mathematical methodology with no connection to anything scientific, technical, or specialized.

Ultimately, Equity cannot establish that its proffered experts should be permitted to testify in this case – other than portions of Mr. Rhodes's opinions – because of lack of qualification, relevance, and reliability. Mr. Barco and Mr. Marine should be excluded and Mr. Rhodes's opinions should be limited.

## PROCEDURAL AND FACTUAL BACKGROUND

This is a class action rooted in Equity's unlawful collection practices and violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"); the North Carolina Collection Agency Act, N.C. Gen. Stat. § 58-70 *et seq.* ("NCCAA"); and the North Carolina Debt Collection Act, N.C. Gen. Stat. § 75-50 *et seq.* ("NCDCA"). Two classes have been certified – (1) Notice of Lien Class; and (2) Notice of Intent to Foreclose Class. The issues of this case revolve around statements made by Equity through auto-generated form notices that misstate the actions that had been taken or could be taken; along with the excessive charges paid in response to these unperformed collection efforts or unsupportable threats. Simply put, Equity charges unconscionable fees to homeowners and then uses unlawful threats to induce payment of those fees.

Plaintiff has alleged in her Complaint that Equity sends homeowners a templated "Notice of Lien" that misrepresents that a lien has been filed on a property when in reality no lien has been filed. At the time the Notice of Lien is sent, Equity demands amounts far in excess of the standard process used by homeowner associations, property management companies, and lawyers in North Carolina. The Notice of Lien uses an unlawful threat to force payment of these excessive amounts.

Similarly, Equity uses a templated "Notice of Intent to Foreclose" notifying homeowners of its intent to foreclose on outstanding liens for assessments. However, the Notice of Intent to Foreclose ignores statutory requirements to provide a detailed accounting of the assessments and fees that are included in the alleged amount due for foreclosure and threatens the "sale of the property" far in advance of any period where the property could be lawfully sold in North Carolina. Again, the Notice of Intent to Foreclose threatens foreclosure under a false and arbitrary deadline to create a false sense of urgency and intimidates the homeowner into paying Equity's grossly

excessive collection costs and arbitrary attorney fees that exceed what is permitted under North Carolina law.

Plaintiff has provided expert reports from Cynthia Jones – a lawyer with over twenty years of experience with representing North Carolina homeowner associations ("HOAs"), and Nancy Tidwell – former owner of an HOA property management company with over thirty years in the North Carolina HOA management industry. Ms. Jones provides her expert opinions on the industry standards in North Carolina when it comes to law firms collecting unpaid HOA dues, the success rates of law firms in collecting, and on the rates charged by North Carolina lawyers. Ms. Tidwell provides her expert opinions on the property management-side of collecting unpaid HOA dues, the success rates of the standard process "3 letter model," and rates charged by North Carolina property management companies.

Equity has provided an expert report from Benjamin Barco, a North Carolina lawyer with experience representing creditors and landlords, but no experience representing HOAs until after the submission of his report. Mr. Barco has been enlisted by Equity to opine on the debt-collection processes of collection agencies and the "reasonableness" of Equity's collection fees. However, at the time Mr. Barco formed his opinions, he had virtually no experience with collection agencies, and admitted to having no experience with HOAs. Mr. Barco's qualifications as an expert in HOAs are non-existent. Similarly, Mr. Barco's basis for his opinions as to the reasonableness of a collection agency's fees was scant and consisted almost entirely of self-serving information provided to him directly by Equity.

Equity has also provided two rebuttal experts to rebut the opinions of Ms. Tidwell. First, Equity has proffered Keith Marine, who is experienced in the HOA property management industry, but who was unable to offer or explain how his experience formed his opinions. His opinions

admittedly came from information and arguments provided to him by Equity Experts. And second, Equity has proffered Ben Rhodes, who is experienced in the property management of HOAs, and consistently agreed with Ms. Tidwell's opinions but strayed from his experience when it came to the reasonableness of Equity's fees. His methodology and process in evaluating Equity's collection practices are conclusory, cherry-picked, and unreliable.

## STANDARD OF REVIEW

Expert testimony is appropriate when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43 (1997); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–95 (1993); *United States v. Forrest*, 429 F.3d 73, 80–81 (4th Cir. 2005); *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275, 2011 U.S. Dist. LEXIS 147633, 2011 WL 6748518, at *5–6 (E.D.N.C. Dec. 22, 2011) (unpublished)*; see also Nix v. Chemours Co. FC,* No. 7:17-CV-189-D, 2023 U.S. Dist. LEXIS 179375, at *26 (E.D.N.C. Oct. 4, 2023).

"[T]he Supreme Court has cautioned that '[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" *United States v. Katsipis*, 598 F. App'x 162, 164 (4th Cir. 2015) (per curiam) (unpublished) (quoting *Daubert*, 509 U.S. at 592–93). The Court should conduct a "rigorous inquiry" into each element to "ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

Rule 702's requirements distill to three crucial inquiries: (1) is the proposed expert

qualified; (2) is the proposed testimony relevant in that it "fits" the issues presented in the case; and (3) is the proposed testimony reliable. *See Kumho Tire*, 526 U.S. at 141; *Daubert*, 509 U.S. at 589; *Nix*, 2023 WL 6471690 at *6. While there is some overlap in the "qualification," "relevance," and "reliability" prongs, they are distinct and should not be conflated. *Frazier*, 387 F.3d at 1260. "The burden of establishing qualification, reliability and helpfulness rest on the proponent of the expert opinion." *Id.* The Court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

Finally, the court must assess whether the expert testimony is helpful to the trier of fact. This factor turns on whether the expert testimony "concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262–63.

## ARGUMENT

### I.    Benjamin Barco Should Be Excluded

Defendant's attorney expert, Benjamin Barco, should be excluded. Although Mr. Barco is an experienced collections attorney, he is simply not qualified to provide the opinions contained in his report because he completely lacks experience with respect to HOAs, HOA foreclosures, or collection agencies. And to the extent Equity elects to offer Mr. Barco based upon his experience with residential foreclosures generally, his testimony is irrelevant and far more likely to cause confusion than to help the trier of fact because of the differences between HOA foreclosures and standard residential mortgage foreclosures.

## A.     Mr. Barco is not Qualified to Provide the Opinions Contained in his Report.

Mr. Barco provided three categories of opinions in his report, entitled (1) "Debt Collection Fees"; (2) "Homeowner's Associations Use of Debt Collectors"; and following a separate section entitled "Summary of Plaintiff's Debt and Assumptions" – which Mr. Barco agreed did not contain any opinions (*See* Deposition of Ben Barco ("Barco Dep."), attached as <u>Exhibit A</u>, at 97:15-98:8); (3) a section entitled "Equity Experts' Fees."  In this last section, Mr. Barco opines that Equity Experts' fees are reasonable.  *See generally* Barco Report, attached as <u>Exhibit B</u>, at 5.

Mr. Barco has worked on behalf of numerous categories of creditors throughout his legal career, including residential landlords, mortgage servicers, and automobile finance companies Ex. A, at 37:10–39:4. However, at the time he formed his opinions and submitted his report in December of 2024, *see* Ex. B. Mr. Barco had no experience with HOAs. **He had never filed a lien or a initiated a foreclosure proceeding on behalf of an HOA**. Ex. A, at 21:4–7.[1] He has nothing on his resume or firm website referencing HOAs. Ex. B, at 9. He is not involved with the primary HOA state-level industry group, the Community Associations Institute ("CAI"); in fact, when asked at his deposition, he had never even heard of CAI.[2] Ex. A, at 26:9–12. He simply has no relevant connection to the HOA industry.

---

[1] Mr. Barco's only experience in the HOA industry came after this report was created and his opinions were formed. He now has a single HOA referral client: Defendant Equity Experts. While it is not relevant to his ability to testify, it reflects his obvious bias. Mr. Barco, now, has fifty to 100 HOA liens that he is working on, all of which he was hired by Equity Experts. Ex. B, at 20:17–20. He charges Equity $150 for each lien. Ex. A, at 87:21–88:2. And Mr. Barco had filed approximately eight foreclosures in 2025, all of which were for Equity Experts. Ex. A, at 20:21–24. He charged Equity $1,200 for those foreclosures, $600 once he's reviewed the title information, and $600 when the proceeding was filed. Ex. A, at 87:21–88:4; 90:11–18.

[2] Every other expert in this case on both sides is heavily involved with CAI and references membership in that organization as an important part of their credentials.

Expertise in one topic does not qualify a witness to testify about another topic. *Williams v. Sig Sauer, Inc*., No. 4:22-CV-48-D, 2025 U.S. Dist. LEXIS 179628, at *10-11 (E.D.N.C. Sep. 8, 2025); *see Brainchild Surgical Devices. LLC v. GPA Glob. Ltd*., 144 F.4th 238, 254 (4th Cir. 2025) (affirming exclusion of expert with experience in international business and contracts to opine on patent renewal services where the expert lacked training or experience with patent renewal services); *see also Sardis v. Overhead Door Corp.,* 10 F.4th 268, 294 (4th Cir. 2021) (affirming exclusion of testimony about an industry standard not sufficiently related to the product at issue and excluding testimony that contradicts standards imposed by governing law).

Whether a witness is qualified to give expert testimony must be determined by "comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton*, 593 F.3d at 616 (quoting *Carroll v. Otis Elevator Co*., 896 F.2d 210, 212 (7th Cir. 1990)).

Having no experience in the HOA industry, Mr. Barco was left with little he could cite as the source of knowledge underlying his opinions. During his deposition, Mr. Barco admitted that he was not an expert in HOA collections. *Id*. at 141:9–13. The knowledge used by Mr. Barco to form his opinions relating to HOAs came from 1) living in an HOA community; 2) his next-door neighbor being the president of the HOA; and 3) conversations with another attorney who was on an HOA Board. *Id.* at 57:2–60:3; 88:5–23. He also admitted much of his knowledge came directly from Equity Experts. *Id.* at 129:25–130:18; 147:10–14; 148:25–13.[3]

---

[3] Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *United States v. Frazier*, 387 F.3d 1244, 1262–63 (11th Cir. 2004).

Mr. Barco's ability to provide opinions as to the reasonableness of a collection agency's fees was similarly slim. Mr. Barco's legal experience is almost exclusively conducted on behalf of large institutional companies who collect internally until they hand the matter off to a collections lawyer like Mr. Barco. *Id.* at 37:10–39:4. Almost none of his client work involves collection agencies. *Id.* at 39:12–42:4. Throughout his entire career, Mr. Barco has only represented a single client who utilized a collection agency. *Id.* at 62:12–23. And this client was a debt buyer wholly unrelated to the HOA industry. *Id.*

Mr. Barco has no relevant professional experience that could form his opinions in this matter. And the actual knowledge base from which Mr. Barco's forms his opinions on collection agencies and the reasonableness of fees are scant. In fact, he testified this knowledge was borne exclusively from "conversations and a review of files." *Id.* at 42:1–15. These conversations took place at some indeterminate time with a colleague along with the sporadic instances of when it comes up in his practice. *Id.* at 146:13–148:24.[4] And the specific files forming this opinion were not identified in his deposition, listed in his report, nor produced when subpoenaed. *See generally* Ex. A.

Despite the total lack of professional knowledge and experience, the primary opinion in Mr. Barco's report pertained to the purported reasonableness of Equity Experts' fees. And his other opinions relate to HOA collections, another topic for which he is admittedly not an expert. Mr. Barco simply has no way to appropriately connect his litigation experience to any of his opinions such that he is qualified to testify as an expert based upon his experience.

---

[4] Mr. Barco did admit he could not recall a situation from his experience where a party charged $6,000 in collection fees. Ex. B, at 143:6–9. Nor could he identify a debt collector whom he had ever seen charge more than Equity Experts. Ex. B, at 154:5–14.

**B.** **The Opinions Which Mr. Barco Might be Qualified to Offer are Irrelevant, Unreliable, Unhelpful, and Confusing to the Jury.**

Equity may argue that Mr. Barco can still provide relevant and helpful opinions to the trier of fact despite the obvious limitations in his background. But any relevant knowledge he has regarding, for example, the civil procedure and process associated with non-judicial foreclosures in North Carolina is of limited relevance. Testimony regarding these issues is far more likely to confuse rather than help the jury. The distinction between HOA foreclosures and the more typical mortgage-based foreclosures is significant as HOA foreclosures have an entirely separate regulatory framework[5].

To be relevant, the proposed expert testimony must fit the facts of the case and be helpful to the trier of fact concerning a claim or defense at issue in the case. *See Daubert*, 509 U.S. at 591–92; *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013). "[R]elevance — or what has been called 'fit' – is a precondition for the admissibility of expert testimony, in that the rules of evidence require expert opinions to assist the 'the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 318 (4th Cir. 2018) (quoting *Daubert*, 509 U.S. at 597). A key "aspect of relevancy ... is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. "Relevant evidence, of course, is evidence that helps 'the trier of fact to understand the evidence or to determine a fact in issue.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017). "Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded." *Sardis*, 10 F.4th at 281 (quotation omitted).

---

[5] HOA foreclosures are governed by Chapter 47F (North Carolina Planned Community Act), N.C.G.S. § 47F-1-101, *et seq.*, while mortgage-based foreclosures are governed by Chapter 45 (Mortgages and Deeds of Trust), N.C.G.S. § 45-1, *et seq.*

Mr. Barco's experience doesn't fit the facts of the case, and any limited relevance from his testimony will only confuse the jury. For example, in the portion of his report titled "Debt Collection Fees," Mr. Barco provided an opinion indicating that attorney fees may range from $1,500 to $4,500 for foreclosure activities. Ex. B, at 4. When asked to reconcile this opinion with the $1,200 cap for foreclosures in uncontested HOA cases, *see* N.C.G.S § 47F-3-116(12), he clarified that his opinion was solely limited to general foreclosure activities, and not for HOA foreclosure activities[6]. Ex. A, at 43:20–44:25. In the same section, Mr. Barco had an opinion on what costs from foreclosure cases might typically be passed on to clients and homeowners, but he again clarified the opinion only related to residential mortgage servicers, not HOAs. *Id.* at 54:13 – 55:23[7]. Neither of those distinctions that were 'clarified' during his deposition appear in his report. This testimony is not only unhelpful but is reasonably likely to confuse the jury by conflating two similar but unrelated issues.

Even if forced to clarify, comparing Mr. Barco's knowledge about 'regular' foreclosures cannot be connected to his opinions reliably. The connections he makes between his practice (i.e. experience in mortgage-related foreclosures) and Equity Experts' are conclusory and unreliable. The trial in this case will be about the legality of Equity's collection letters which precede court

---

[6] As further examples, at the time of his report, Mr. Barco had no understanding of how often HOA foreclosure cases are contested; he did agree that his current HOA foreclosure cases for Equity are uncontested. Ex. A, at 51:13–52:11. He had no understanding of the success rate achieved by the "standard process" used by most North Carolina HOAs and testified to by every other expert in this case. Again, at the time of his report, he had never represented an HOA.

[7] Nor is it clear that any of Equity's $3,445 is tied to work that would be done by an attorney or costs incurred by an attorney. No bills from Equity's foreclosure counsel were reviewed by Mr. Barco, or produced in discovery, and Equity's fee structure differentiates between Equity's charges and the charges for attorneys. Ex. A, at 103:1–8;105:10–20. An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).

filings (and the unreasonable charges sought to collect, that were in fact collected, through those letters). Even more, Mr. Barco's knowledge of the traditional mortgage-related foreclosure process is irrelevant when there was no foreclosure proceeding filed against Ms. Lewis.

Without any facts on which to base his opinion or specific methodology for arriving at a reliable inference, an expert's opinion is merely conjectural. *See Wartsila NSD N. Am.,Inc. v. Hill Int'l, Inc.*, 299 F. Supp. 2d 400, 406 (D.N.J. 2003) (expert testimony inadmissible where no methodology for expert's inferences was given and court was left with "nothing more than [expert's] subjective belief"); *Am. Marine Rail NJ, LLC v. City of Bayonne,* 289 F. Supp. 2d 569, 589 (D.N.J. 2003) (expert testimony inadmissible where expert's "opinion is purely speculative, and not supported by a reliable foundation"); *Webb v Carnival Corp.*, 321 F.R.D. 420, 429 (S.D. Fla. 2017) (excluding as unreliable proffered opinions that "simply lists a number of conclusory statements without any foundation").

Mr. Barco offers opinions on the purported advantages and disadvantages of HOA's use of debt collectors, liens, and foreclosures, ostensibly offering expert analysis as to why it often makes sense for an HOA to use Equity. But Mr. Barco cannot reliably or reasonably conduct a pros/cons analysis when he has 1) no understanding of one side of the equation: the 'standard process' involving a series of letters, a lawyer placing a lien; and proceeding to foreclosure if absolutely necessary (see discussion of the 'standard process' *infra*); *and* 2) no independent understanding of the other side of this equation: the reasonableness of Equity Experts' fees.

Mr. Barco also has no experience with collection agencies. His opinion on the reasonableness of Equity's fees simply points to a document prepared for litigation, an 'exhibit' to

the Declaration of Jacqueline Galofaro in Opposition to Plaintiff's Motion for Class Certification.[8] Mr. Barco then makes a conclusory assertion that the fees are reasonable. This does not help the jury. All Mr. Barco does is parrot the talking points from Equity Experts; but Equity can offer those through fact testimony and arguments from counsel.

Mr. Barco's opinions about foreclosure activities or debt collection litigation generally, as opposed to the statutorily regulated mechanisms provided by the NC Planned Community Act, are also irrelevant. And any limited relevance is far outweighed by the potential for confusion by the jury based on the speculative and conclusory connections drawn between Mr. Barco's legal world and the world inhabited by Equity Experts. Mr. Barco cannot help the jury and his expert opinions should be excluded.

II. <u>**Rebuttal Expert Keith Marine's Opinions Should Be Excluded**</u>

Equity's first Rebuttal Expert Keith Marine didn't understand the assignment. From the start, his testimony was that of a fact witness. When asked at his deposition about the basis for several of the opinions contained in his report, he refused to give an opinion, stating that he "did not want to speculate." *See* Deposition of Keith Marine ("Marine Dep."), attached as <u>Exhibit C</u>, at 44:5–11; 46:25–47:3; 48:22–49:10; 49:11–20. Although he was designated only as a rebuttal expert to the opinions of Nancy Tidwell, Mr. Marine testified that he was an expert in Equity's business model, business processes, and standard operating procedures. Ex. C, at 6:13–7:1; 8:18– 22. In other words, he admitted to being a fact witness. While Mr. Marine has experience in the

---

[8] Although Ms. Galofaro attaches a document as an exhibit to her declaration, this document was prepared for the sole purpose of litigation. It is not a business record, but simply more declarations from Ms. Galofaro that for some reason were converted into an exhibit to her declarations. *See* Declaration of Jacqueline Galofaro in Opposition to Plaintiff's Motion to Certify Class Action [DE 63-1].

HOA industry, he has no way to tie that experience to the opinions formed in his report such that his experience can reliably serve as the foundation for his opinions.

### A. Mr. Marine Cannot Reliably Connect His Experience to His Opinions.

Mr. Marine was proffered as a rebuttal expert to the proposed expert testimony of Nancy Tidwell. Early in his report, he summarized his opinions as: (1) Equity's fees are reasonable "compared to market standards and average;" (2) Equity's fees are "justified and reasonable when benchmarked against attorney rates"; and (3) Equity's processes and procedures educate homeowners about the responsibilities and consequences of nonpayment." *See* Marine Report, attached as Exhibit D, at 3.

Mr. Marine conceded that his opinions arose entirely from his experience. Ex. C, at 53:14–54:1; 111:13–113:9; 128:10–129:10. His knowledge of Equity's policies and procedures came from his general memory of how it worked during his time as the President of the Raleigh branch of Associa-HRW, a property management company. *Id*. at 29:4–11; 61:13–25. Mr. Marine worked there from 2017 through May 2024 and was president until 2023. *Id.* at 90:13–16. HRW worked with Equity Experts during that time[9] and Mr. Marine has personal knowledge regarding Equity based upon his role.[10] *Id*. at 31:15–18.

---

[9] Associa has an ongoing partnership with Equity Experts where Equity Experts pays Associa money to refer them collection files from Associa's managed HOAs. *See* Ex. C, at 27:5-21 https://equityexperts.org/associa-hcs/; https://equityexperts.org/integrated-partnership/; (last visited October 31, 2025).

[10] Mr. Marine has extensive experience in the industry and was questioned at length by Equity's counsel about his work on a lobbying arm of CAI. *Id.* at 99:23–106:23. But other than saying it added to his overall experience in the industry (*Id.* at 129:3–10), he was unable to connect this experience to any relevant portion of his opinion other than to suggest that the daughter of Plaintiff's property management expert, Nancy Tidwell, was biased as to Equity Experts. *Id*. at 106:24–109:16.

13

When a witness relies solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *See United States v. Frazier*, 387 F.3d 1244, 1248 (11th Cir. 2004) ("If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong. Thus, it remains a basic foundation for admissibility that proposed expert testimony must be supported by appropriate validation – i.e., "good grounds," based on what is known.). An expert's qualification and experience alone are not sufficient to render his opinions reliable. The testimony must also assist the trier of fact. *Frazier*, F.3d at 1248.

Mr. Marine never explained how his experience reliably informed his opinions. For example, Mr. Marine formed an opinion that Equity's fees were reasonable compared to "market standards and averages," where the "market" referred to what collection agencies and lawyers charge.[11] Ex. C, at 35:12–36:6. His opinion on typical rates for attorney fees was formed without consulting any documentation which might inform his opinion on typical rates. *Id.* at 36:11–17. **He was unable to opine on what the average fee a North Carolina HOA attorney might charge for a lien because he didn't want to "speculate."** *Id.* at 44:5–44:11. In the end, the entire basis for his opinion on the "industry standards" and "benchmarks" reflecting reasonableness of fees was because he himself said they were reasonable.

Mr. Marine's opinion on typical rates from collection agencies was informed by his memory of a company, Collection Alliance Services, in Florida which pitched their services to Mr.

---

[11] Mr. Marine did not include HOAs and property management companies collecting their own debt as part of this "market" but suggested that the first 90 days of collections are usually done through the management company at a charge of $10 to $20 per month. Ex. C, at 84:1–85:17. He also noted that the letters from the management company contain much of the same "educational" language that he suggests makes Equity so unique and valuable. *Id.* at 85:25–86:15.

Marine but were never hired. *Id.* at 39:16–24. He had no documents to support his opinion that the rates provided in the pitch were comparable, and it is unclear how he could apply his experience to their rates when he never worked with them or had any relationship outside of this initial meeting.

His dubious claims regarding the "educational value" of Equity Experts' processes came solely from Equity Experts, not from his experience. Mr. Marine formed an opinion that Equity Expert's deferred-cost collection model is beneficial, and that Equity Experts processes and procedures "educate" homeowners about the responsibilities and consequences of non-payment. *Id.* at 50:1–11. The additional processes and procedures referenced in his opinion are that Equity Experts makes continual phone calls to homeowners which "educate" the homeowner. *Id.* at 52:3–22. He learned that the calls were "educational" from Equity (*Id.* at 55:1–4) and from unnamed homeowners who he claims told him that Equity "share[d] with them the seriousness and mandatory necessity of assessments." *Id.* at 56:16–57:1.

Mr. Marine formed his opinion that Equity's deferred-cost collection model was beneficial based upon Equity's sales materials (which were not listed in the documents he reviewed and were never produced), and his general memory that some unnamed associations were positive about Equity (the names were not disclosed because he could not remember). *Id.* at 60:22–61:2. But again, other than where his information was directly parroted from the materials provided by Equity, Mr. Marine could not provide a single specific instance from his experience which informed his opinions.

As such, Mr. Marine's opinions derived solely from his experience are simply unreliable. *Daubert* and Rule 702 demand expert opinions that reflect sound reasoning grounded in facts, rather than conclusory and unsubstantiated statements that constitute inadmissible *ipse dixit*. *See*,

e.g., *Sardis*, 10 F.4th at 289, 290; *see also, e.g., Joiner* 522 U.S. at 146 (nothing "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Rule 702 requires application of "the principles and methods reliably to the facts of the case," rather than be based on "belief or speculation." *Cooper v. Smith & Nephew, Inc*., 259 F.3d 194, 200 (4th Cir. 2001); *see Sardis*, 10 F.4th at 290 ("The trial court's gatekeeping function requires more than simply "taking the expert's word for it." (quotation omitted)); *Frye v. Daimler-Trucks N. Am., LLC*, 2021 WL 4241658, *8 (N.D. Ga. Mar. 11, 2021) (unpublished) (excluding opinions as unreliable, court explained that expert's "opinions are connected to the evidence only by his *ipse-dixit*"); *see also Webb v Carnival Corp*., 321 F.R.D. 420, 429 (S.D. Fla. 2017) (excluding as unreliable proffered opinions that "simply lists a number of conclusory statements without any foundation").

An expert's opinion testimony becomes inadmissible where it is connected to existing data only by the *ipse dixit* of the expert. An impressive resume does not guarantee relevancy. The expert's opinion must "fit" the case, and his *ipse dixit* that it does is never enough. *Joiner*, 522 U.S. at 146 (1997); *see Davis v. Duran*, 277 F.R.D. 362, 368 (N.D. Ill. 2011).

Mr. Marine uses terms like "industry standards" and "benchmarked" but makes no effort to analyze or explain how his experience allows him to reliably make these assertions. His assertions regarding Equity's educational processes were fed to him directly by Equity. Mr. Marine makes conclusory statements taken straight from Equity Expert's submissions in this case and asks the reader to take his word for it because he has a long career in the industry. This is classic "*ipse dixit*" that is insufficient under *Daubert*.

Although Mr. Marine spent most of his deposition retreating from his opinions as admittedly being speculative, he was unabashed in speculating as to the various motives of Ms.

Lewis and her HOA, Abbington Ridge. As to Ms. Lewis, he opined, based upon her ledger alone, that she became unresponsive to the HOA's collection efforts in 2018 and 2019 which prompted the HOA Board of Directors to escalate her account to Equity Experts for collections. Ex. C, at 74:14–76:10. And he similarly testified, based upon the ledger alone, to Abbington Ridge's motive for retaining Equity. *Id*. at 76:14–78:11. But he was unable to offer a single reason for how his experience in the industry allows him to speculate on the intent of these third-parties. *See generally Id*. at 74:17–81:3. And in the end, Mr. Marine admitted that he couldn't speak to board members' thoughts. *Id*. at 80:22 – 81:3. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *Frazier*, 387 F.3d at 1262–63 (11th Cir. 2004). If Equity wants to argue that Ms. Lewis' failure to make immediate payment of Equity's exorbitant fees "forced" Equity into charging her additional exorbitant fees, it must do so directly, not with the false veneer of Mr. Marine's asserted expertise.

Mr. Marine may have expertise with HOAs, but his conclusory testimony lacks foundation and cannot be reliably connected to his experience. He should be excluded.

### III.     Rebuttal Expert Ben Rhodes Should be Partially Excluded

Ben Rhodes was proffered as an additional rebuttal expert to Nancy Tidwell's expert report. He is senior vice president for CAMS, a property management company that, like Mr. Marine's employer HRW, is owned by Associa. *See* Deposition of Ben Rhodes ("Rhodes Dep."), attached as Exhibit E, at 15:10–13; 16:24–17:3. Mr. Rhodes spends half of his time professionally with homeowners educating them on the HOA industry. Ex. E, at 175:6–11; 177:2–10.

Mr. Rhodes's report is not as easily distilled into bullet points as those of his fellow experts, but essentially his opinion and testimony compares the "standard process" used by most of CAMS's customers with homeowners in default on their obligations with Equity's process. Mr.

Rhodes argues that Equity's fees are reasonable compared to "the standard process," and that the substantially increased fees are a result of the increased amount of work performed by Equity in comparison with work by attorneys. *See generally,* Rhodes Report, attached as <u>Exhibit F</u>.

Some of Mr. Rhodes's opinions stem from his experience and had a degree of specificity that Mr. Marine lacked completely. In forming his opinions, Mr. Rhodes relied in part upon internal software for CAMS and internal documents used by CAMS. Ex. F, at 5, 8. Mr. Rhodes utilized a portion of CAMS' current fee schedule for collecting on behalf of their HOAs, applied it to CAMS's existing collection strategy, and compared it to industry norms. *Id.* at 5.

In discussing how CAMS collects debts, Mr. Rhodes discussed that the "standard process"[12] in the industry for collections includes three letters over the course of approximately 90 days: first, a courtesy notice; second, a late notice; third, a demand notice; and then at last turned over to a third-party attorney. Ex. E, at 20:3–21:19. CAMS charges approximately $10 to send these late letters, with the demand notice getting as high as $65. *Id.* at 56:21–57:19. CAMS offers payment plans to its homeowners and charges $10 per month to do so. *Id.* at 34:22–35:2; 56:12–19. This standard collection process is generally 98% successful. *Id.* at 21:20–25.

For the remaining 2%, Mr. Rhodes agreed that, generally, the sooner you can put a lien in place the better off everyone is. *Id.* at 37:11–24. CAMS charges $60 to send a file to a lawyer to place a lien and proceed from there. *Id.* at 58:16–19. Mr. Rhodes agreed with Plaintiff's experts that a lawyer would charge about $450 to $500 to get a lien on file. *Id.* at 74:18–75:2. Mr. Rhodes

---

[12] Other than Mr. Barco (who admitted to having no relevant knowledge or experiences), each proposed expert in the case confirmed that this is how the HOA collection process normally works. Ex. E, at 20:3–21:5; Ex. C, 83:16–85:5; *See* Deposition of Nancy Tidwell, attached as <u>Exhibit G</u>, at 115:2–119:6; See Deposition of Cynthia Jones, attached as <u>Exhibit H</u>, at 43:3–16.

also agreed that some firms bill on a deferred schedule; meaning that lawyers would not bill the association until they've collected the funds. *Id.* at 82:12–16.

Based on Mr. Rhodes's experience with the standard process, the total charged to a homeowner who reached a lien level would be around $500 to $600 to have a lien placed on the property. *Id.* at 85:3–85:18. For the exceedingly rare cases which reach foreclosure, CAMS charges $150 to prepare the file to go to the foreclosure attorney. *Id.* at 58:20–23. In Mr. Rhodes's experience, 99.5+% of cases do not reach foreclosure. *Id.* at 61:2–63:15. Plaintiff does not oppose Mr. Rhodes's expert opinions on the standard process.

### A. Mr. Rhodes's Opinions as to Consistency of Equity's Fees and CAMS Fees Have No Connection to the Data Offered.

Mr. Rhodes also offers the opinion that there is some consistency between the amounts charged by Equity and by CAMS where specific services overlap.[13] This opinion was based upon comparing CAMS fee schedule to Equity's listed fee schedule but is seemingly belied by the evidence. However, Mr. Rhodes agreed that he cannot draw on his experience from CAMS to determine whether Equity's overall fees are reasonable. *Id.* at 141:3–17.

In examining Ms. Lewis's ledger in stages, he agreed that charging $600 in fees when a homeowner was one month in arrears is "outside the norm of what he would normally see." *Id.* at 124:14–18. At less than two months in, $1,300 in fees accrued is "outside the norm as well." *Id.* at 125:14–20. And he conceded that fees which amounted to **ten times the unpaid principal two months in** is on "the higher side of what we would normally see." *Id.* at 127:19–25. At seven months in, no lien and $3,000 in collection fees was also "not consistent with what we would

---

[13]Mr. Rhodes distinguished between Equity and the "standard process," by noting that Equity offers additional services beyond traditional management companies so that not everything overlaps but agreed "most of those services are phone calls." Ex. E, at 59:10–60:1.

normally see." *Id.* at 129:23–130:5. Mr. Rhodes couldn't come up with one collection policy[14]—ever—that allowed for fees to the degree charged by Equity Experts. *Id.* at 181:22–182:9. He had never seen this amount of collection fees in twenty years in the industry. *Id.* at 128:1–5.

A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *See Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir.), cert. denied, 506 U.S. 826 (1992); *see also Joiner*, 522 U.S. at 146 (1997). Mr. Rhodes's efforts to tie CAMS fee schedule to Equity's may be based upon his experience and have some accompanying data, but there is simply no connection to make when looking at the overall amounts of charges assessed. And to the extent that Equity offers that it is performing enormous amounts of extra work to collect from the less than 1% of individuals who require collections, Mr. Rhodes lacks experience to comment on the extent and value of Equity's work. Mr. Rhodes ultimately declined to comment on whether Equity's overall fees are reasonable because he doesn't know the work that goes into them and that he "can't really speak to the norm as it relates to a collection agency and their fees." *Id.* at 130:6–25; 140:12–141:17. Mr. Rhodes lacks sufficient foundation to opine on Equity's fees being reasonable compared with CAMS when the fee amounts on their face are miles apart and where Mr. Rhodes is not qualified to testify as to whatever extra work Equity does to earn those extra fees.

### B. Mr. Rhodes's Methodology Used to Calculate the Reasonableness of Equity's Fees Is Unreliable and Should be Excluded.

Mr. Rhodes's other avenue regarding the reasonableness of Equity's fees, which was formed without any tie to his ample experience, is not a close call for *Daubert* purposes. Rather than rely on the charges he "normally see[s]," or upon his experience, Mr. Rhodes offered up a

---

[14] Mr. Rhodes noted that it is best practices for HOAs to have a collection policy that outlines explicitly how much fees should be. *Id.* at 48:22–49:1.

simplistic arithmetic-based methodology to explain why he believes Equity's fees are reasonable. Mr. Rhodes formed his opinion on Equity's fees using a methodology that he referred to as a "per touch basis." *Id.* at 38:19–39:25. He estimated thirty (30) minutes per touch for thirty-six (36) outgoing collection phone calls (many of which were not answered), twelve (12) return calls and sixteen (16) letters sent. *Id. at* 38:7-18; 40:1–14. And he calculated an "hourly rate" based upon his 'thirty minutes per touch' methodology. This opinion should be excluded as the methodology is unsupported.

Mr. Rhodes offered no support for "thirty minutes per touch," conceding it was a rough estimate. *Id.* at 40:19–41:10. This estimate is also inconsistent with Equity's records. While Mr. Rhodes indicated he reviewed the account notes to see how much time was *actually* spent, he did not recall the specific account notes or what they contained. *Id.* at 40:19–42:6. When reviewing Equity's records during his deposition, Mr. Rhodes agreed many of these "touches" have records in Equity's files indicating they were at most two minutes. *Id.* at 107:21–108:4; 109:11–21; 113:8– 16. He offered that CAMS' internal records keeps track of its average length of phone calls with customers at four to five minutes. *Id.* at 109:1–3. He agreed an average unanswered phone call would be less than a minute and templated letters could take less than a minute. *Id.*at 117:8–10; 118:13–17. And critically, Mr. Rhodes did not review the deposition transcripts of the employees who outlined the specific steps involved in completing their day-to-day tasks but agreed it would have been helpful for him to have done so.[15] *Id.* at 185:23–186:7.

The inquiry into reliability must focus on "principles and methodology" and not the expert witness's conclusions. *Daubert*, 509 U.S. at 595. The reliability inquiry is a "flexible one focusing

---

[15] This is especially important because these employees directly contradicted the assumption that each "touch" averaged 30 minutes. *See* Memorandum In Support of Plaintiff's Motion for Class Certification, at 6–7. [DE 57].

on the principles and methodology employed by the expert, not on the conclusions reached." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). In assessing whether expert testimony is "reliable," the court may consider: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the techniques' operation; and (5) whether the technique has received general acceptance within the relevant scientific or expert community. *United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003).

These factors are "neither definitive, nor exhaustive," and "particular factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Cooper v. Smith & Nephew, Inc*., 259 F.3d 194, 199–200 (4th Cir. 2001). "[T]he court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful[,] ... depend[ing] upon the unique circumstances of the expert testimony involved." *Westberry*, 178 F.3d at 261. To be reliable, an expert opinion must be "based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Oglesby v. Gen. Motors Corp*., 190 F.3d 244, 250 (4th Cir. 1999). "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).

Mr. Rhodes's opinions as to the reasonableness of Equity's fees using his "per touch" method are not based upon anything scientific, technical, or specialized. Mr. Rhodes offered no support for his "30 minutes per-touch methodology," and ultimately agreed there was ample evidence in the record to support otherwise.

Nor is Mr. Rhodes the person who can adequately explain how Equity really may spend enormous amounts of time on unanswered phone calls, templated letters, and other collections

tasks. He cannot comment on whether Equity's fees are reasonable because he doesn't know the work that goes into them. Ex. E, at 139:21–140:11. And he cannot draw on his experience from CAMS to determine whether their fees are reasonable. *Id.* at 141:3–17. This methodology is unreliable and appears to have been reverse-engineered to find an hourly rate which appeared to be somewhat reasonable.

The variance in Mr. Rhodes's opinions draw the sharp distinction between valid opinions based upon experience and speculative conclusory opinions from experienced people with absolutely no ties to their experience. Many of his opinions draw from his existing experience or even provide exemplar data from CAMS software. But some of his other opinions have no foundation at all. Simply making up an amount of time spent to justify fees which are completely at odds with "what we normally see in the industry," is not close to the level of reliability necessary to form a valid opinion under *Daubert*.

Without any facts on which to base his opinion or specific methodology for arriving at a reliable inference, an expert's opinion is merely conjectural. *See Wartsila NSD N. Am.,* 299 F. Supp. 2d at 406 (expert testimony inadmissible where no methodology for expert's inferences was given and court was left with "nothing more than [expert's] subjective belief"); *Am. Marine Rail NJ, LLC,* 289 F. Supp. 2d at 589 (expert testimony inadmissible where expert's "opinion is purely speculative, and not supported by a reliable foundation"). As a result, Mr. Rhodes's opinions as to the reasonableness of Equity's charge should be excluded.

IV.     **Opinions Contrary to the Law of the Case Should be Excluded**

Lastly, each person should be prohibited from basing their opinion without comparing to the underlying debt. Mr. Barco provided the opinion that the fees do not have any relationship to the underlying debt. Ex. B, at 135:4–7. Mr. Marine also opined that collection fees do not have to

relate to the principal amount collected. Ex. C, at 33:18–23; 34:17–22. And Mr. Rhodes did the same. Ex. E, at 124:22–125:13. However, this Court has already ruled that the fees must bear some relationship to the underlying debt. *See* Court's Order entered on January 6, 2025, re: Class Certification at 13–14 [DE 85].

Expert opinions that conflict with controlling law are unreliable. *See Long v. Amada Mfg. Am., Inc*., No. 1:02-CV-1235, 2004 U.S. Dist. LEXIS 30708, 2004 WL 5492705, at *13 (N.D. Ga. Mar. 31, 2004) (citations omitted) ("[T]he [c]ourt holds that such opinions would not be reliable inasmuch as they conflict with controlling law."); *Bailey v. Allgas, Inc*., 148 F. Supp. 2d 1222, 1242–46 (N.D. Ala. 2000) (finding expert testimony unreliable because it was "contrary to well-established law" in the Eleventh Circuit); *see also Pledger v. Reliance Tr. Co*., No. 1:15-CV-4444-MHC, 2019 U.S. Dist. LEXIS 45668, at *22 (N.D. Ga. Feb. 25, 2019).

Equity's proffered expert opinions on collection fees not needing to relate to the underlying debt are contradictory, irrelevant, and not helpful to the trier of fact where the Court has already ruled contrary to the opinions. "[R]elevance — or what has been called 'fit' - is a precondition for the admissibility of expert testimony, in that the rules of evidence require expert opinions to assist the 'the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 318 (4th Cir. 2018) (quoting *Daubert*, 509 U.S. at 597). A key "aspect of relevancy ... is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. "Relevant evidence, of course, is evidence that helps 'the trier of fact to understand the evidence or to determine a fact in issue.'" *Nease v. Ford Motor Co*., 848 F.3d 219, 229 (4th Cir. 2017). Plaintiff would be entitled to a jury instruction stating exactly the opposite of an opinion

offered by Equity's experts. Therefore, any testimony regarding Equity's fees which ignores the enormous gap between the underlying debt and the fees charged should be excluded.

**<u>CONCLUSION</u>**

Plaintiff respectfully requests that the Court exclude the all of Defendant's experts' opinions of Mr. Barco and Mr. Marine, and partially exclude the expert opinions of Mr. Rhodes for the argument and support stated above.

Respectfully submitted this 31st day of October 2025.

**MAGINNIS HOWARD**

*/s/ Edward H. Maginnis*
EDWARD H. MAGINNIS
N.C. State Bar No.: 39317
KARL S. GWALTNEY
N.C. State Bar No.: 45118
IAN E. VANCE
N. C. State Bar No.: 60056
7706 Six Forks Road, Suite 101
Raleigh, North Carolina 27615
Tel: 919-526-0450
Fax: 919-882-8763
emaginnis@carolinalaw.com
kgwaltney@carolinalaw.com
ivance@carolinalaw.com

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on October 31, 2025, I electronically served the foregoing PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION TO STRIKE OPINIONS OF DEFENDANT'S EXPERT BEN BARCO, REBUTTAL EXPERT KEITH MARINE AND PARTIAL MOTION TO EXCLUDE REBUTTAL EXPERT BEN RHODES to all attorneys of record.

Dated: October 31, 2025

                                               */s/ Edward H. Maginnis*